# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued November 22, 2013     Decided December 23, 2014

No. 12-1321

NATURAL RESOURCES DEFENSE COUNCIL,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY AND GINA
MCCARTHY,
RESPONDENTS

---

On Petition for Review of Final Administrative Action
of the United States Environmental Protection Agency

---

*Seth L. Johnson* argued the cause for petitioner. With him on the briefs were *David S. Baron*, and *Robert Yuhnke*.

*Christopher Kilian* and *Caitlin Peale* were on the brief for *amicus curiae* Conservation Law Foundation in support of petitioner.

*Kenneth C. Amaditz*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief was *Jan M. Tierney*, Attorney, U.S. Environmental Protection Agency.

Before: TATEL and SRINIVASAN, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

Dissenting opinion filed by *Senior Circuit Judge* RANDOLPH.

SRINIVASAN, *Circuit Judge*: Under the Clean Air Act, the Environmental Protection Agency promulgates National Ambient Air Quality Standards for air pollutants. The Act calls for EPA periodically to reconsider those standards. In 2008, EPA revised and strengthened the standards for ozone.

This case concerns two challenges to EPA's regulations implementing the more stringent 2008 ozone standards. First, EPA allowed affected regions more time to attain the new ozone standards—roughly a one-third increase in time for certain areas, amounting to an additional year—as compared with the previous revision. Second, EPA revoked certain requirements, known as transportation conformity requirements, applicable to areas that had yet to attain governing ozone standards or that had recently come into attainment but remained under obligations aimed to prevent any reversion to nonattainment status. The transportation conformity requirements obligate affected regions to assure that any proposed project to develop transportation infrastructure—potentially resulting in significantly increased emissions—will align with the maximum emissions levels established in EPA-approved plans for meeting air quality standards.

We conclude that both challenged aspects of EPA's regulations implementing the 2008 ozone standards exceed the agency's authority under the Clean Air Act. First, with regard to the attainment deadlines, all statutory indications militate against allowing the agency's lengthening of the periods for achieving compliance with revised air quality

standards. Indeed, the last time EPA issued revised standards for ozone, EPA itself declined to extend the attainment periods in essentially the same way it now proposes, concluding that such an adjustment could not be squared with the statute. Second, with regard to the revocation of transportation conformity requirements, the terms of the statute straightforwardly require maintaining those requirements for affected areas. If it were otherwise, a region that had yet to demonstrate an enduring ability to meet ozone standards would be free to undertake transportation projects that would increase emissions substantially beyond the levels permitted in the area's approved air-quality plan, undercutting the Act's objectives. Because we find that the EPA's challenged implementation rules exceed the agency's authority under the Clean Air Act, we vacate the pertinent portions of EPA's regulations.

I.

A.

1. The Clean Air Act (CAA), 42 U.S.C. §§ 7401 *et seq.*, requires EPA to publish a list of air pollutants that "may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7408(a)(1)(A); *see EPA v. EME Homer City Generation*, *L.P.*, 134 S. Ct. 1584, 1594 (2014). For each such pollutant, EPA must issue a "primary" National Ambient Air Quality Standard (NAAQS), specifying the level of air quality "requisite to protect the public health" while "allowing an adequate margin of safety." 42 U.S.C. § 7409(b)(1). EPA must also promulgate a "secondary" NAAQS, setting the "level of air quality . . . requisite to protect the public welfare." 42 U.S.C. § 7409(b)(2).

"Once EPA establishes NAAQS for a particular pollutant, the standards become the centerpiece of a complex statutory regime aimed at reducing the pollutant's atmospheric concentration." *Am. Trucking Ass'ns, Inc. v. EPA* (*ATA III*), 283 F.3d 355, 358-59 (D.C. Cir. 2002). EPA, in coordination with state governments, divides the country geographically into "[a]ir quality control region[s]." 42 U.S.C. § 7407. EPA then designates each region as either (i) "attainment," if the region's atmospheric concentration of the pollutant falls below the allowed level; (ii) "nonattainment," if it does not; or (iii) "unclassifiable," if there is insufficient information. *See id*. § 7407(d)(1)(A). Each state must then enact a state implementation plan (SIP) that "provides for implementation, maintenance, and enforcement of [the] primary" NAAQS. *Id*. § 7410(a)(1). States must submit their SIPs for EPA approval, and the agency can require revisions or impose a federal implementation plan if a SIP proves inadequate. *See id*. § 7410(c)(1).

When a region's atmospheric pollutant concentration changes, EPA may alter the area's designation. For instance, EPA can redesignate an attainment area to nonattainment when the pollutant concentration rises. *See id*. § 7407(d)(3). The statute permits redesignation in the other direction, from nonattainment to attainment, only upon satisfaction of several additional requirements. *See id*. § 7407(d)(3)(E). EPA must determine, inter alia, that "the improvement in air quality is due to permanent and enforceable reductions in emissions." *Id*. § 7407(d)(3)(E)(iii). EPA must also approve a "maintenance plan" to ensure that the area remains in compliance with the standard. *See id*. § 7407(d)(3)(E)(iv). Maintenance requirements remain in effect for twenty years after redesignation. *See id*. § 7505a(a)-(b). EPA refers to former nonattainment areas that have been redesignated to

attainment, but that remain subject to maintenance requirements, as "maintenance areas."

Both maintenance areas and nonattainment areas must adhere to the Clean Air Act's transportation conformity requirements. *See id.* § 7506(c). Those requirements condition federal funding and approval of an area's proposed transportation projects on their compliance with applicable SIPs. The conformity requirements mandate that emissions resulting from covered projects will not interfere with NAAQS attainment. *See id.*

The Clean Air Act calls for EPA to conduct a "thorough review" of each NAAQS every five years and "make such revisions . . . and promulgate such new standards as may be appropriate." *Id*. § 7409(d)(1). Although EPA may revise a NAAQS to "relax[]" the standard, the Act contains an anti-backsliding provision which requires the agency to "promulgate requirements" that "provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation." *Id*. § 7502(e). The anti-backsliding provision presents one example of how the Act "reflects Congress's intent that air quality should be improved until safe and never allowed to retreat thereafter." *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 900 (D.C. Cir. 2006).

2. This case concerns the NAAQS for ground-level ozone ($O_3$), a key component of urban smog. While ozone is an "essential presence in the atmosphere's stratospheric layer," exposure to ozone at ground level "can cause lung dysfunction, coughing, wheezing, shortness of breath, nausea, respiratory infection, and in some cases, permanent scarring of the lung tissue." *South Coast*, 472 F.3d at 887. EPA has determined that ozone also "has a broad array of effects on

trees, vegetation, and crops and can indirectly affect other ecosystem components such as soil, water, and wildlife." *Mississippi v. EPA*, 744 F.3d 1334, 1340 (D.C. Cir. 2013).

Ground-level ozone does not directly result from human activity. It instead arises from the reaction of other atmospheric pollutants (known as precursors) in the presence of sunlight. *ATA III*, 283 F.3d at 359. Ozone's precursor pollutants primarily come from emissions produced by cars, power plants, and chemical solvents. *Id.*

EPA classifies areas as having differing "ozone seasons": the sunnier months of the year when ozone forms at higher rates. In most parts of the country, ozone seasons last from March or April until September or October. Other areas possess longer, or even year-round, ozone seasons. *See* 40 C.F.R. pt. 58, app. D, tbl.D-3 (Mar. 18, 2013); *see also* Implementation of the 2008 NAAQS for Ozone: Nonattainment Area Classifications Approach, Attainment Deadlines and Revocation of the 1997 Ozone Standards for Transportation Conformity Purposes, 77 Fed. Reg. 30,160, 30,166 nn.16-17 (May 21, 2012).

B.

The history of Congress's and EPA's efforts to establish air quality standards for ozone—and of the judicial responses to those efforts—provides important context for considering the issues presented by this case.

1. In 1979, EPA promulgated primary and secondary NAAQS for ozone with a limit of 0.12 parts per million (ppm)—known as the "one-hour" standards, because they measured average ozone levels over one-hour periods. *See* Revisions to the NAAQS for Photochemical Oxidants, 44

Fed. Reg. 8202, 8202 (Feb. 8, 1979). The Clean Air Act as amended in 1977 required states to achieve compliance with the one-hour ozone NAAQS by December 31, 1987. *See South Coast*, 472 F.3d at 886. The statute afforded EPA and the states "broad discretion" as to the means of compliance. *Id.* at 886-87. That discretionary approach ultimately accomplished "little to reduce the dangers of key contaminants." *Id.* For instance, according to congressional testimony, the number of regions violating the one-hour ozone NAAQS actually increased between August 1987 and February 1989. *Id.*

2. After nearly a decade of debate, Congress amended the Clean Air Act in 1990 to "abandon[] the discretion-filled approach of two decades prior in favor of more comprehensive regulation" of ozone and five other pollutants. *Id.*; *see* 42 U.S.C. §§ 7511-7514a. The amendments moved the prior, discretionary approach to Subpart 1 of Part D of Subchapter I, where it continued to apply as a default matter to pollutants not specifically addressed in the amended portions of the Act. *See* 42 U.S.C. § 7502(a)(1)(C). Congress enacted Subpart 2 to govern ozone. *See id.* §§ 7511-7511f (Subpart 2). Subpart 2 contains "a graduated classification scheme that prescribe[s] mandatory controls that each state must incorporate into its SIP." *South Coast*, 472 F.3d at 887.

The "backbone" of Subpart 2 is "Table 1," which classifies all nonattainment areas for ozone by operation of law. *Whitman*, 531 U.S. at 484; *see also* 42 U.S.C. § 7511(a)(1) tbl.1 (Table 1).[†]  Table 1 includes five classification categories representing graduated degrees of non-compliance with the NAAQS: Marginal, Moderate, Serious, Severe, and Extreme.  For each classification, the table lists a range of "Design value[s]," the range of ground-level ozone concentrations for that classification.  Table 1 expresses design values in terms of the one-hour ozone NAAQS in effect at the time of the 1990 amendments.  For example, the range for the Marginal category begins at 0.121 ppm, just above the one-hour limit of 0.12 ppm.

---

[†] Table 1 appears in the statute as follows:

TABLE 1

| Area class | Design value* | Primary standard attainment date** |
|---|---|---|
| Marginal................ | 0.121 up to 0.138..... | …………3 years after November 15, 1990 |
| Moderate............... | 0.138 up to 0.160..... | ................6 years after November 15, 1990 |
| Serious.................. | 0.160 up to 0.180..... | ................9 years after November 15, 1990 |
| Severe................... | 0.180 up to 0.280..... | ..............15 years after November 15, 1990 |
| Extreme................. | 0.280 and above….... | ..............20 years after November 15, 1990 |

\*    The design value is measured in parts per million (ppm).
\*\*    The primary standard attainment date is measured from November 15, 1990.

Subpart 2 requires all nonattainment areas to achieve the primary NAAQS "as expeditiously as practicable," but no later than the "Primary standard attainment date" in Table 1. 42 U.S.C. § 7511(a)(1) & tbl.1. Higher classifications—more polluted areas—receive more time to attain compliance. Unless already classified as Severe or Extreme, areas that fail to attain the NAAQS by the statutory deadline are automatically reclassified to the next highest classification, *see id*. § 7511(b)(2), allowing more time for compliance but imposing a harsher set of mandatory controls. *See South Coast*, 472 F.3d at 887. The statute imposes additional penalties on Severe and Extreme areas that fail to meet the listed deadlines. *See* 42 U.S.C. § 7511d.

3. In 1997, citing new information suggesting a correlation between prolonged ozone exposure and "a wide range of health effects," EPA promulgated new NAAQS for ground-level ozone. *See* NAAQS for Ozone, 62 Fed. Reg. 38,856, 38,861 (July 18, 1997). EPA replaced the one-hour, 0.12 ppm standard with a 0.08 ppm standard measured over an eight-hour period. *See id.* at 38,856. The agency explained that an eight-hour, 0.09 ppm standard would have "generally represent[ed] the continuation of the [old] level of protection." *Id.* at 38,858. The additional reduction from 0.09 ppm to 0.08 ppm manifested a strengthening of the standard. The regulation stated that the preexisting primary one-hour NAAQS, governed by Subpart 2 of the statute, would remain in effect, but only for areas yet to attain the one-hour standard and only until they did so. *Id.* at 38,873. Subpart 1 alone thus would govern the 1997 primary NAAQS. *Id.*

This court rejected EPA's attempt to apply Subpart 1 to the new primary 1997 standard, holding that Subpart 2 must govern any revised primary ozone NAAQS. *Am. Trucking*

*Ass'ns, Inc. v. EPA (ATA I)*, 175 F.3d 1027, 1050 (D.C. Cir. 1999), *modified on reh'g*, 195 F.3d 4 (D.C. Cir. 1999). We found that conclusion mandated by the plain text of the statute at step one of the framework prescribed by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *ATA I*, 175 F.3d at 1048. On certiorari, the Supreme Court agreed that EPA could not rely exclusively on Subpart 1 to implement the 1997 primary NAAQS because Subpart 2 "unquestionably" "provide[s] for classifying nonattainment ozone areas under the revised standard." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 482 (2001). The Court, however, reached that conclusion at *Chevron* step two rather than step one. *Id.* at 484.

The Court identified various ways in which the statute, on its face, was silent as to how Subpart 2 should apply when EPA revises the ozone standard. *See id.* at 483-84. Of most relevance here, the Court noted a timing gap in Table 1 stemming from the table's use of the enactment date of the 1990 amendments (November 15, 1990) as the starting point when prescribing the allowable attainment periods. That approach "seems to make no sense for areas that are first classified under a new standard after November 15, 1990. If, for example, areas were classified in the year 2000, many of the deadlines would already have expired at the time of classification." *Id.* at 483-84.

In light of the identified gaps in the statute, the Court found the amended Act "ambiguous concerning the manner in which Subpart 1 and Subpart 2 interact with regard to revised ozone standards." *Id.* at 484. The Court stated that it therefore would "defer to the EPA's reasonable resolution of that ambiguity," under *Chevron* step two. *Id.* But "emphasiz[ing]" the "narrow scope" of the identified gaps, *South Coast*, 472 F.3d at 889, the Court held that "EPA's

interpretation making Subpart 2 abruptly obsolete" went "over the edge of reasonable interpretation." *Whitman*, 531 U.S. at 485. "The principal distinction between Subpart 1 and Subpart 2," the Court explained, "is that the latter eliminates regulatory discretion that the former allowed." *Id.* at 484. The agency therefore could "not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." *Id.* at 485.

4. In 2003, with EPA yet to implement the 1997 primary NAAQS in the aftermath of the Supreme Court decision in *Whitman*, several environmental organizations sued the agency, arguing that it had failed to designate areas (as attainment or nonattainment) within the statutory deadlines. *See* 42 U.S.C. § 7407(d)(1); Air Quality Designations and Classifications for the 8-Hour Ozone NAAQS; Early Action Compact Areas With Deferred Effective Dates, 69 Fed. Reg. 23,858, 23,860 (Apr. 30, 2004). EPA entered into a consent decree requiring it to issue designations by April 15, 2004. 69 Fed. Reg. at 23,860. The agency promulgated designations on April 30, 2004. *See id.* at 23,858.

EPA also contemporaneously issued a new implementation rule for the 1997 NAAQS. *See* Final Rule to Implement the 8-Hour Ozone NAAQS—Phase 1, 69 Fed. Reg. 23,951, 23,951 (Apr. 30, 2004) (2004 Rule). Of particular salience, the rule filled the timing gap for Subpart 2 compliance dates by applying the same attainment periods established in Table 1—e.g., three years for Marginal areas, six years for Moderate areas, and so on—but measured from the effective date of EPA's designations for the 1997 NAAQS, June 15, 2004 (rather than from the November 15, 1990, enactment date of the 1990 amendments). *Id.* at 23,967. EPA considered an alternative approach under which it would extend the attainment deadlines by several months, to

November or December of the relevant year (e.g., to November or December 2007 for Marginal areas). *See id.* The agency determined, however, that it lacked statutory authority to extend the attainment deadlines in that fashion. *See id.*

As a general matter, the 2004 Rule addressed the transition from the old one-hour NAAQS to the new 1997 standard by "revok[ing] the 1-hour standard in full, including the associated designations and classifications." *Id.* at 23,954. Interpreting the statute's anti-backsliding provision to apply to the 1997 NAAQS, *see* 42 U.S.C. § 7502(e), the rule mandated that all "controls" from the one-hour standard remain in place after revocation of the one-hour NAAQS. *See* Final Rule To Implement the 8-Hour Ozone NAAQS—Phase 1, 69 Fed. Reg. at 23,972. EPA concluded, however, that certain requirements in Subpart 2 failed to qualify as "controls" within the meaning of the anti-backsliding provision. Those requirements, including transportation conformity obligations and attainment contingency plans, would not be retained after the NAAQS transition. *See id.* at 23,984-87.

This court invalidated several aspects of the 2004 Rule. *See South Coast*, 472 F.3d at 890-905. We partially rejected the rule's approach to the prior, one-hour NAAQS. *See id.* at 899-905. We initially explained that EPA does possess power to revoke a superseded standard in full: because EPA may make "appropriate" "revisions" to an ozone NAAQS, *see* 42 U.S.C. § 7409(d)(1), the agency "retains the authority to revoke the one-hour standard so long as adequate . . . provisions are introduced" to satisfy the anti-backsliding requirements of 42 U.S.C. § 7502(e). *South Coast*, 472 F.3d at 899. But we rejected as "impermissible backsliding" EPA's failure to maintain several requirements associated

with the one-hour NAAQS on the flawed theory that they were not "controls" (including "rate-of-progress milestones, contingency plans, and motor vehicle emissions budgets"). *Id.* at 900.

5. In 2000, while the litigation concerning the 1997 NAAQS was underway, EPA initiated a new round of ozone NAAQS review. *See Mississippi*, 744 F.3d at 1340. EPA promulgated a revised NAAQS in 2008, in compliance with a schedule adopted by consent decree. *See id.* Citing new data concerning ozone's health effects, EPA lowered the primary and secondary standards to 0.075 ppm, measured using the same eight-hour average as the 1997 NAAQS. *See* NAAQS for Ozone, 73 Fed. Reg. 16,436, 16,436 (Mar. 27, 2008).

EPA originally intended to designate areas under the 2008 NAAQS within two years of their issuance, by March 12, 2010. *See* Air Quality Designations for the 2008 Ozone NAAQS, 77 Fed. Reg. 30,088, 30,090 (May 21, 2012). The agency extended the designation deadline by one year, to March 12, 2011, citing its authority under 42 U.S.C. § 7407(d)(1)(B). *See* 77 Fed. Reg. at 30,090-91. When the extended deadline passed, an environmental organization sued to compel EPA to issue the designations. EPA entered into a consent decree requiring it to sign a final rule designating areas by May 31, 2012. *See id.* The agency issued a final rule on May 21, 2012, designating most areas of the United States effective July 20, 2012. *See id.* at 30,088.

On the same day, EPA promulgated the implementation rule at issue in this case. *See* Implementation of the 2008 NAAQS for Ozone: Nonattainment Area Classifications Approach, Attainment Deadlines and Revocation of the 1997 Ozone Standards for Transportation Conformity Purposes, 77 Fed. Reg. 30,160 (May 21, 2012) (Implementation Rule).

The Implementation Rule applies Subpart 2 to all nonattainment areas for the 2008 NAAQS, translating the one-hour design values in Table 1 to correspond to the new 0.075 ppm, eight-hour standard. *See id.* at 30,161-64. The rule contains two additional actions challenged here. First, rather than setting attainment deadlines based on the attainment periods in Table 1 measured from the effective date of the new designations—as EPA had done in the 2004 Rule—the agency extended the attainment deadlines by several months to "December 31 of the [corresponding] calendar year." *Id.* at 30,166. Second, EPA revoked the 1997 NAAQS for purposes of, and only for purposes of, the transportation conformity requirements. *See id.* at 30,167-68. The rule otherwise leaves the 1997 NAAQS in place to operate in parallel with the 2008 NAAQS.

## II.

NRDC petitions for review of the Implementation Rule, challenging its schedule of attainment deadlines and its revocation of the 1997 NAAQS for transportation conformity purposes. We have jurisdiction to hear the petition under 42 U.S.C. § 7607(b)(1). NRDC contends that the challenged portions of the rule are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 42 U.S.C. § 7607(d)(9)(A). We apply the same standard of review for arbitrary-and-capricious challenges under the Clean Air Act as we do for similar challenges under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See Catawba County v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009).

We review EPA's interpretation of the Clean Air Act pursuant to the two-step *Chevron* framework. *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2439 (2014). "Under *Chevron*, we presume that when an agency-

administered statute is ambiguous with respect to what it prescribes, Congress has empowered the agency to resolve the ambiguity. The question for a reviewing court is whether in doing so the agency has acted reasonably and thus has 'stayed within the bounds of its statutory authority.'" *Id.* (quoting *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013)). Applying that standard, we agree with both challenges to the Implementation Rule, and we therefore vacate the rule in relevant part.

A.

NRDC first challenges the Implementation Rule's schedule of Subpart 2 attainment deadlines as contrary to the statute and as an arbitrary and capricious change from prior agency practice. Because we conclude that the rule's deadlines cannot be squared with the statute, we do not reach the arbitrary-and-capricious challenge.

Subpart 2 of the statute requires all nonattainment areas to achieve compliance with the ozone NAAQS "as expeditiously as practicable," but in all events "not later than" the "Primary standard attainment date" set forth in Table 1. 42 U.S.C. § 7511(a)(1). The Table 1 attainment dates, which operated as initial deadlines for complying with the primary NAAQS under the 1990 Clean Air Act amendments, specify a set number of years for each classification measured from the date of "enactment" of the amendments. 104 Stat. 2423(a)(1) (1990). After the statute's enactment, the actual enactment date—November 15, 1990—was substituted into each row of the table. So, for example, Table 1 expresses the attainment deadline for Marginal areas as "3 years after November 15, 1990," for Moderate areas as "6 years after November 15, 1990," and so forth. 42 U.S.C. § 7511(a)(1) tbl.1. Under the parties' nomenclature, Table 1 thus prescribes an "attainment

period" of three years for Marginal areas, commencing on a "trigger date" of November 15, 1990. Importantly, the November 15, 1990, trigger date is the date on which Congress specified that the initial designations/classifications (e.g., nonattainment/Marginal) under the 1990 amendments would take effect. *See id*. §§ 7407(d)(1)(C), 7511(a)(1). Congress set the trigger date, that is, as the designation date—i.e., the effective date of the designations/classifications.

In addition to prescribing the attainment deadlines for areas initially designated as nonattainment under the 1990 amendments, Congress also specified the attainment deadlines for any area subsequently *redesignated* from attainment to nonattainment. An area redesignated to nonattainment receives its classification as Marginal, Moderate, and the like, on the date of the redesignation. *See id*. § 7511(b)(1). With regard to the attainment deadlines for such an area, Congress applied the same approach as it did for areas initially designated as nonattainment: the statute mandates using the same attainment periods in Table 1, with a trigger date of the designation—or in this case, redesignation—date. *See id.* An area redesignated to nonattainment and classified as Marginal thus would be required to attain the governing NAAQS within three years of the redesignation date, an area redesignated to nonattainment and classified as Moderate would be required to attain the applicable NAAQS within six years of the redesignation date, and so on.

While Subpart 2 specifies the attainment deadlines both for initial designations under the 1990 amendments and for subsequent redesignations of areas from attainment to nonattainment, the statute does not, on its face, prescribe the calculation of attainment deadlines when EPA promulgates a *revised* NAAQS, as it did here. *See Whitman*, 531 U.S. at 483-84. As the Supreme Court recognized in *Whitman*, it

would "make no sense" strictly to apply the attainment deadlines from Table 1 to areas newly designated under a revised NAAQS. *Id.* at 483. In the case of a revised standard issued years after the Table 1 trigger date of November 15, 1990, "many of the deadlines would already have expired." *Id.* at 484. The Act therefore contains a "timing gap," *South Coast*, 472 F.3d at 889, requiring application of Subpart 2 to a revised NAAQS but without directly setting forth the attainment deadlines. *See Whitman*, 531 U.S. at 483-85.

Because "the statute is silent or ambiguous with respect to the specific issue," we do not conclude, at *Chevron* step one, that "Congress has directly spoken to the precise question." *City of Arlington*, 133 S. Ct. at 1868 (quoting *Chevron*, 467 U.S. at 842-43); *see also South Coast*, 472 F.3d at 892-93 (noting ambiguity from related statutory gaps). We thus proceed to *Chevron* step two and assess "whether the agency's answer is based on a permissible construction of the statute." *South Coast*, 472 F.3d at 891 (quoting *Chevron*, 467 U.S. at 843). We conclude it is not.

In assessing the permissibility under the statute of EPA's attainment deadlines for the 2008 NAAQS, it is instructive to consider the agency's current approach against the backdrop of its contrasting methodology when implementing the 1997 NAAQS. When it implemented the 1997 NAAQS, the agency, consistent with the Supreme Court's explanation in *Whitman*, acknowledged that rote application of the Table 1 deadlines to the revised NAAQS "would produce absurd results." *See* Final Rule To Implement the 8-Hour Ozone NAAQS—Phase 1, 69 Fed. Reg. at 23,967. EPA nonetheless did "not believe" that Subpart 2's timing gap "allows broad authority to re-write the statute." *Id.* Instead, looking "to the legislative history and other provisions of the CAA to discern Congressional intent," *id.*, EPA applied the same approach to

the revised 1997 NAAQS as Congress had prescribed for the initial designations and subsequent redesignations. The agency set the trigger date as the designation date—June 15, 2004, the "effective date of designations and classifications for the 8-hour ozone NAAQS"—and applied the attainment periods established in Table 1 for each classification. *Id.* The deadlines accordingly fell on June 15 of the attainment year: June 15, 2007, for Marginal areas, June 15, 2010, for Moderate areas, and so on.

EPA materially altered course in its Implementation Rule for the 2008 NAAQS, at issue here. *See* Implementation Rule, 77 Fed. Reg. at 30,160. The agency considered adhering to the 2004 Rule's approach: using the attainment periods from Table 1 and a trigger date equaling "the effective date of designation[s]" under the revised NAAQS. *Id.* at 30, 165. Because designations and classifications for the 2008 NAAQS became effective on July 20, 2012, *see* Air Quality Designations for the 2008 Ozone NAAQS, 77 Fed. Reg. at 30,088, that option would have yielded an attainment deadline for Marginal areas of three years from that date, or July 20, 2015. The agency rejected that approach, however, in favor of an alternative one under which it set attainment deadlines to "December 31 of the calendar year that is the number of years specified for each classification in Table 1 with the number of years running from" the year of designation, or 2012. Implementation Rule, 77 Fed. Reg. at 30,166. In other words, instead of setting the trigger date as the designation date under the revised NAAQS—July 20, 2012—EPA deferred the trigger date to December 31, 2012, giving Marginal areas, for instance, a later attainment deadline of December 31, 2015, instead of July 20, 2015.

EPA identifies no statutory basis in Subpart 2 for deferring the trigger date to December 31 of the designation

year. To the contrary, all textual indications point to triggering commencement of the attainment periods on the designation date, rather than delaying the trigger date to some other date selected by the agency. Congress, as explained, prescribed the initial attainment deadlines under the 1990 amendments based on a trigger date set as the designation date—November 15, 1990, the date on which initial designations and classifications took effect. *See* 42 U.S.C. §§ 7407(d)(1)(C), 7511(a)(1). For areas redesignated to nonattainment under an existing NAAQS, Congress likewise required measuring the attainment deadlines based on a trigger date equaling the redesignation date. *See id.* § 7511(b)(1). Congress's decision to run the Table 1 attainment periods starting from the designation date in each part of Subpart 2 that directly addresses that issue strongly suggests that the same trigger date should apply when adapting Table 1 to the analogous situation of a revised NAAQS. The trigger date (and attainment deadlines) for the 2008 NAAQS then would fall on July 20 rather than December 31.

Indeed, EPA itself previously concluded that it lacked statutory authority to establish precisely the same December attainment deadlines it now adopts in the Implementation Rule. When the agency implemented the 1997 NAAQS, it prescribed a trigger date of the designation date—June 15, 2004—resulting in attainment deadlines of June 15 of the attainment year for each classification. EPA specifically rejected an alternative approach, supported by several commentators, under which it would have extended the attainment deadlines by several months to "November or December of the attainment year." 2004 Rule, 69 Fed. Reg. at 23,967. "We do not believe we have [that] authority," EPA explained, because "Congress would have intended for areas designated nonattainment and classified under subpart 2 for

the [1997] NAAQS to have attainment periods consistent with those in Table 1 (e.g., 3 years for marginal areas . . . )." *Id.*

There is thus a notable contrast between EPA's implementation of the 2008 NAAQS and its implementation of the 1997 NAAQS. Designations under the 1997 revised NAAQS became effective in June of the designation year (on June 15, 2004), and designations under the 2008 revised NAAQS became effective at a similar point during the designation year (on July 20, 2012). But whereas EPA explicitly declined to adopt an attainment deadline of December of the attainment year for the 1997 NAAQS, concluding that it had no statutory authority to do so, EPA nonetheless prescribed an attainment deadline of December 31 of the attainment year for the 2008 NAAQS. EPA did so, moreover, even though it expressly continues to believe that it lacks statutory authority to extend the Table 1 attainment periods—the same view it held when implementing the 1997 NAAQS. *See* EPA, Response to Comments on Implementation of the 2008 NAAQS for Ozone: Nonattainment Area Classifications Approach, Attainment Deadlines, and Revocation of the 1997 Ozone Standards for Transportation Conformity Purposes, Dkt. No. EPA-HQ-OAR-2010-0885 41 (2012).

In its briefing in this court, the agency suggests that the seeming discrepancy can be explained based on an ostensible distinction between (i) extending the trigger date at the *front* end of the attainment period by several months (the current approach) and (ii) extending the attainment deadline at the *back* end of the attainment period by several months (the rejected approach). That distinction in form, however, is not one in substance: in either case, the effect is to extend the resulting attainment deadlines by several months to December of the attainment year. Those "attainment deadlines," we

have explained, "are central to the regulatory scheme." *Sierra Club v. EPA* (*Sierra Club-delay*), 294 F.3d 155, 161 (D.C. Cir. 2002) (internal quotation marks and ellipsis omitted). And because the substantive effect for the attainment deadlines is precisely the same, there is no reason to suppose that Congress (concededly) disallowed the latter approach but nevertheless allowed the former one.

That is all the more apparent in light of additional constraints on EPA's authority to extend the attainment deadlines for the 2008 NAAQS. EPA does not dispute that Subpart 2 dramatically limited the agency's authority to extend attainment deadlines after promulgating them: Subpart 2 permits the agency to extend the deadlines for at most two years under limited circumstances, *see* 42 U.S.C. § 7511(a)(5), unlike Subpart 1, which gives the agency much broader discretion to extend attainment dates for as long as 12 years, *see id.* § 7502(a)(2)(A), (C). *See Whitman*, 531 U.S. at 485. EPA also lacked authority to delay the attainment deadlines indirectly, either by deferring designation of nonattainment areas or by withholding issuance of a revised NAAQS in the first place: The Clean Air Act requires EPA periodically to promulgate revised NAAQS according to specified deadlines, 42 U.S.C. § 7409(d)(1), and generally requires EPA to issue designations within two years of promulgating a revised NAAQS, *id.* § 7407(d)(1)(B)(i). EPA entered into consent decrees aimed to enforce those provisions under which it agreed to promulgate revised NAAQS by March 2008 and to issue designations by May 2012. *See* Air Quality Designations for the 2008 Ozone NAAQS, 77 Fed. Reg. at 30,090; NAAQS for Ozone, 73 Fed. Reg. at 16,438.

In short, EPA correctly concedes that it had no authority to extend overall attainment deadlines to the end of the

calendar year by either (i) delaying its promulgation of the revised NAAQS; (ii) deferring its designation of areas under the revised NAAQS; (iii) granting a blanket deadline extension following its initial establishment of attainment deadlines for the revised NAAQS; or (iv) extending the attainment periods set forth in Table 1. The agency nonetheless seeks to achieve precisely the same result simply by introducing a nominally distinct category of extension—namely, by delaying the trigger date for the start of the (concededly fixed) attainment periods until some agency-selected date, rather than measuring the attainment periods from the designation date, as EPA did for the 1997 NAAQS and as the statute prescribes both for the initial designations/classifications under the 1990 amendments and for subsequent redesignations.

Even assuming EPA could adequately justify choosing a trigger date other than the designation date, it has failed to do so here. EPA attempts to explain its departure from the designation date by reference to the number of "ozone seasons" within which nonattainment areas must achieve the revised standard. *See* Implementation Rule, 77 Fed. Reg. at 30,166. The 2008 NAAQS, like its predecessors, requires averaging three calendar years of ozone concentration data to determine an area's ozone levels. Under the applicable regulations, each calendar year of data must include measurements spanning that year's full ozone season. As a result, if the attainment deadline falls *during* an ozone season, the data for that entire year cannot be used in the calculation. For instance, an area classified as Marginal under the 2008 NAAQS would, if the trigger date were set to the designation date, face an attainment deadline of July 20, 2015. If the area's ozone season runs from April to September, ozone measurements from 2015 could not be used to determine compliance because the 2015 ozone season would not have

ended by the July attainment deadline. Data from calendar years 2012, 2013, and 2014 thus would be used. Under the Implementation Rule, by contrast, the attainment deadline would be delayed until December 31, 2015—after completion of the 2015 ozone season—allowing use of measurements from 2013, 2014, and 2015. Because all ozone seasons end after July 20, the Implementation Rule's delay of attainment deadlines effectively allows one additional year to achieve the 2008 standard as compared with EPA's approach for the 2004 NAAQS, a roughly one-third increase in compliance time for Marginal areas.

EPA suggests that allowing an additional ozone season for compliance serves an interest in establishing achievable attainment deadlines. It is not our role to question the agency's policy judgment in that regard. It is our role, however, to determine whether the statute authorizes EPA to base Subpart 2 attainment deadlines on that policy judgment. As the Supreme Court recently explained, "EPA must 'ground its reasons for action or inaction in the statute,' rather than on 'reasoning divorced from the statutory text.'" *Util. Air Regulatory Grp.*, 134 S. Ct. at 2411 (emphasis and citation omitted) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 532, 535 (2007)). EPA identifies no statutory provision giving it free-form discretion to set Subpart 2 compliance deadlines based on its own policy assessment concerning the number of ozone seasons within which a nonattainment area should be expected to achieve compliance. *Cf. Whitman*, 531 U.S. at 484 ("The principal distinction between Subpart 1 and Subpart 2 is that the latter eliminates regulatory discretion that the former allowed."). To the contrary, the "attainment deadlines . . . leave no room for claims of technological or economic infeasibility." *Sierra Club-delay*, 294 F.3d at 161 (internal quotation marks and brackets omitted).

EPA's ozone-season explanation lacks any grounding in the statute.  The agency itself previously recognized as much.  When EPA declined to extend the attainment deadlines to "November or December" of the attainment year in its implementation of the 1997 NAAQS, the reason cited in support of the proposed extension was to enable "areas [to] use the ozone season air quality data from the attainment year to demonstrate attainment"—precisely the same explanation now invoked by the agency.  At the time, however, EPA did "not believe [it] ha[d] authority to change the attainment dates to November or December of the attainment year."  2004 Rule, 69 Fed. Reg. at 23,967.  The agency points to no intervening statutory change that would now give it authority to extend the attainment deadlines for reasons having to do with ozone seasons.  The point here is not that an agency is barred from changing its mind.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  The point instead is that EPA had it right the first time in concluding that the statute gave it no authority to extend the attainment deadlines based on ozone seasons.

EPA's current ozone-season rationale in fact runs counter to all indicia of congressional intent.  As an initial matter, the agency itself acknowledges Congress's awareness that ozone measurements are taken over a three-year period and require full ozone seasons of data.  Congress even used the concept of "high ozone season" in other parts of the statute.  *See, e.g.*, 42 U.S.C. § 7545(h)(1).  Yet despite that awareness, Congress chose to measure the initial Table 1 attainment deadlines in "years," not "ozone seasons."

Notably, moreover, Congress set December 31 attainment dates elsewhere in the 1990 amendments in analogous provisions governing pollutants other than ozone, *see, e.g.*, *id*. § 7512(a)(1) (Subpart 3 attainment deadlines for

carbon monoxide); *id*. § 7513(c)(1)-(2) (Subpart 4 attainment deadlines for particulate matter), as well as in a special rule pertaining to Subpart 2 "[t]ransitional areas," *see id.* § 7511e. By contrast, Congress tellingly declined to use a December 31 attainment date in Table 1, instead opting for a specific period of years triggered on the designation date. *Cf. Dean v. United States*, 556 U.S. 568, 573 (2009) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (brackets omitted)). Congress likewise declined to take ozone seasons into account when setting attainment deadlines for areas redesignated to nonattainment, *see* 42 U.S.C. § 7511(b)(1), even though redesignation by nature can occur at any point during the year. Most newly redesignated "Marginal" areas therefore would not receive three new ozone seasons to achieve compliance.

Those statutory choices indicate rejection of the ozone-season justification that underlies the Implementation Rule's attainment deadlines. EPA responds that, because the enactment date of the 1990 amendments turned out to be November 15—after the end of ozone season in most regions—most Marginal areas under those amendments in practice had three new ozone seasons to come into compliance. That may be so, but there is no indication Congress intended (or even contemplated) that result. The statutory language linking Table 1 deadlines to the enactment date appeared in the bill reported out of committee in May 1990, substantially before the end of ozone season. *See* H.R. Rep. No. 101-490 pt. 1, at 17 (1990). The fact that enactment ultimately occurred late in the calendar year, after completion of most ozone seasons, thus was happenstance.

At any rate, while ozone season had ended by November 15 in many areas (such as all parts of Colorado), it had yet to end in areas with year-round seasons (including all of California). *See* 40 C.F.R. pt. 58, app. D, tbl.D-3. EPA offers no explanation for why, if Congress had ozone seasons in mind, it would have granted three ozone seasons to Marginal areas in Colorado but only two to Marginal areas in California. Had Congress desired in Subpart 2 to grant an equal number of ozone seasons to all areas, it presumably would have set the attainment date to December 31, just as it contemporaneously did in Subparts 3 and 4. Congress did not do so.

EPA's delay of the trigger date for the fixed attainment periods to the end of the calendar year, based on the agency's ozone-season rationale, is "untethered to Congress's approach" and thus fails at *Chevron* step two. *South Coast*, 472 F.3d at 894. This is not the first time a court has rejected certain aspects of EPA's implementation of a revised NAAQS for ozone at *Chevron* step two. The Supreme Court did so in *Whitman*, 531 U.S. at 481-86, and we later did the same, *South Coast*, 472 F.3d at 894-95. We do so again here with regard to the Implementation Rule's attainment deadlines.

## B.

NRDC's second challenge concerns the Implementation Rule's revocation of the 1997 NAAQS for purposes of the Clean Air Act's transportation conformity requirements. According to NRDC, the partial revocation both exceeds EPA's statutory authority and violates the Act's anti-backsliding provision. We agree that EPA lacks authority to revoke the conformity requirements, and we therefore do not address the applicability of the anti-backsliding provision.

The transportation conformity requirements, 42 U.S.C. § 7506(c), "integrate[] the Clean Air Act with the transportation planning process by conditioning federal approval and funding of transportation activities on their demonstrated compliance with applicable SIPs." *Sierra Club v. EPA* (*Sierra Club-conformity*), 129 F.3d 137, 138 (D.C. Cir. 1997). "In enacting the 1990 Amendments, Congress was particularly concerned with pollution arising from automobile emissions." *South Coast*, 472 F.3d at 904. Congress accordingly strengthened the transportation conformity requirements. As amended, the statute requires transportation planners to estimate emissions from covered projects to assure that new emissions will not thwart NAAQS attainment. *See id.* EPA implemented that statutory mandate through motor vehicle emissions budgets, which "identif[y] those vehicle emissions that can be produced without jeopardizing an area's attainment status." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 842 (5th Cir. 2003). Emissions associated with proposed transportation projects must stay within "the motor vehicle emissions budget(s) established in the applicable implementation plan." 40 C.F.R. § 93.118(a).

The Implementation Rule "revoke[s] the 1997 ozone NAAQS one year after the effective date of designations for the 2008 ozone NAAQS for transportation conformity purposes only." Implementation Rule, 77 Fed. Reg. at 30,167. The rule leaves the 1997 NAAQS in place for all other purposes. *See id.* at 30,168. As a result, all 1997 designations and maintenance requirements remain in effect. This case thus raises no questions concerning EPA's authority to revoke the 1997 NAAQS in full, as EPA has now proposed to do in a proposed rule published during the pendency of this case. *See* Implementation of the 2008 NAAQS for Ozone: State Implementation Plan Requirements, 78 Fed. Reg. 34,178 (June 6, 2013). If that proposed rule were to develop

into a final rule, it might itself become the subject of a future challenge. The sole question now before us in this case, however, is whether EPA can revoke the transportation conformity requirements alone.

Under the plain terms of the statute, EPA lacks authority to revoke the 1997 transportation conformity requirements alone, while otherwise preserving the 1997 NAAQS. The conformity provision's "Applicability" paragraph straightforwardly prescribes that the conformity requirements "shall apply" to:

> (A) a nonattainment area . . . ; and

> (B) an area that was designated as a nonattainment area but that was later redesignated . . . as an attainment area and that is required to develop a maintenance plan . . . .

42 U.S.C. § 7506(c)(5). EPA does not deny the mandatory nature of the conformity requirements for all nonattainment and maintenance areas. Nor does EPA dispute that all nonattainment designations and maintenance requirements remain in place for the 1997 NAAQS. Rather, EPA seeks to turn off the conformity requirements—and those requirements alone—for areas that remain in nonattainment or maintenance status under the 1997 NAAQS. The statute forbids that result. It mandates application of the conformity requirements, without exception, for "a nonattainment area" and for a former nonattainment area "redesignated" as "an attainment area" and "required to develop a maintenance plan." *Id.*

Our precedent compels that understanding. As we have previously explained: "The Clean Air Act categorically mandates that the transportation conformity requirements

shall apply to nonattainment and maintenance areas." *Sierra Club-conformity*, 129 F.3d at 138 (citing 42 U.S.C. § 7506(c)(5)). We therefore held that the plain text of the statute "does not authorize the EPA to limit the applicability of the conformity requirements by exempting some nonattainment areas, even for a limited period of time." *Id.* at 142. The regulation at issue in that case established a one-year "grace period" during which newly designated nonattainment areas received an exemption from the conformity requirements. *See id.* at 139. We invalidated the regulation at *Chevron* step one, concluding that the "grace period impermissibly creates an exception to the unqualified requirement in the statute." *Id.* at 140. And although the plain text resolved the issue, we also found it "instructive" that Congress strengthened the conformity requirements in the 1990 amendments based on concerns that the prior version had been "largely ignored by the agencies required to apply" it. *Id.* at 140 (ellipsis omitted) (quoting legislative history). The amended statute left no discretion for EPA to suspend the conformity requirements alone for even a year. For the same reason, EPA lacks authority *permanently* to suspend (i.e., revoke) the conformity requirements, as it would do here.

EPA identifies no statutory provision specifically authorizing revocation of the conformity requirements alone in that fashion. The agency instead relies on its power to revoke a NAAQS in its entirety. In *South Coast*, we recognized EPA's power to revoke a prior NAAQS in toto when it promulgates a revised standard. In implementing the 1997 NAAQS, the agency had "revoke[d]" the prior one-hour NAAQS "in full, including the associated designations." *South Coast*, 472 F.3d at 898. Noting EPA's statutory obligation to conduct a periodic "review" of existing NAAQS and to "make such revisions . . . as may be appropriate," we held that the statute authorized EPA's total revocation of the

prior NAAQS, subject to the anti-backsliding provision. *See id.* at 899 (quoting 42 U.S.C. § 7409(d)(1)). EPA contends that, because it has authority to revoke the 1997 NAAQS entirely, it also possesses authority to revoke the conformity requirements alone while leaving the rest of the 1997 NAAQS in place. We are unpersuaded by EPA's greater-includes-the-lesser-power argument.

We have no occasion to consider whether EPA can effect a partial revocation of other parts of a NAAQS besides the transportation conformity requirements. With regard to the transportation conformity requirements, however, the statute disallows the agency to eliminate those requirements alone. Our decision in *South Coast* does not suggest otherwise. Because the 2004 Rule considered in *South Coast* revoked the prior NAAQS "in full, including the associated designations," *id.* at 898, there remained no nonattainment areas or maintenance areas for purposes of the previous, fully revoked standard. By contrast, the Implementation Rule at issue here leaves all 1997 designations and maintenance requirements in place. Any area that qualified as a nonattainment area or a maintenance area before the Implementation Rule took effect retains that status thereafter. The statute "categorically mandates that the transportation conformity requirements shall apply to" those "nonattainment and maintenance areas." *Sierra Club-conformity*, 129 F.3d at 138. We therefore conclude, at *Chevron* step one, *see id.* at 140, that EPA lacks authority to eliminate the conformity requirements alone—whether it characterizes the elimination as a partial "revocation" or otherwise.

It is true, as our dissenting colleague observes, *see* Dissent Op. at 4-6, that NRDC made no argument in its opening brief in this Court (or previously before the agency) in favor of distinguishing between revocation of a NAAQS in

its entirety and revocation of the transportation conformity requirements alone. But NRDC was not required to do so. NRDC argued in its opening brief (and before the agency) that the plain language of the statute prohibits elimination of the transportation conformity requirements. *See* Pet'r's Opening Br. 21-23, 35-38; Comments by David S. Baron, Atty, EarthJustice, on Proposal at 77 Fed. Reg. 8197 (Feb. 14, 2012), Dkt. No.: EPA-HQ-OAR-2010-0885 3 (Mar. 15, 2012). NRDC was not obligated to go further and anticipate in its opening brief that EPA would later respond by invoking its power under *South Coast* to eliminate a NAAQS in full. *See* Resp't Br. 43-45. Only after EPA did so did it become salient to draw a distinction between revoking a NAAQS in its entirety and revoking the transportation conformity requirements alone. *See* Pet'r's Reply Br. 18-20. The statutory terms, as explained, forbid the latter approach.

Because the plain terms of the statute resolve the matter, EPA's rationale for eliminating the conformity requirements cannot justify its action. The agency's explanation falls short in any event. EPA asserts that revocation of the 1997 conformity requirements "makes the most sense because it would result in only one ozone NAAQS—the 2008 ozone NAAQS—applying for purposes of transportation conformity." Implementation Rule, 77 Fed. Reg. at 30,167. That would avoid the "unnecessary complexity" that state and local planning authorities would confront if "required to implement the transportation conformity program for both ozone NAAQS concurrently." *Id.* at 30,168. EPA reasons that, because any area initially designated as nonattainment for purposes of the 2008 NAAQS would thereby become subject to the conformity requirements, the Implementation Rule "provides a seamless transition" to the "more protective" 2008 NAAQS, "leav[ing] no gap in conformity's application

in any 2008 ozone *nonattainment* area." *Id.* (emphasis added).

The rule, however, leaves a gap in conformity coverage for certain 2008 ozone *attainment* areas—specifically, any area initially designated as attainment under the 2008 NAAQS but still designated as nonattainment or subject to maintenance requirements for the 1997 NAAQS. An area could remain designated as nonattainment under the 1997 NAAQS despite having attained the more stringent 2008 standard if it had yet to satisfy the additional requirements for redesignation from nonattainment to attainment for the 1997 standard—for instance, if EPA had yet to determine that the area's "improvement in air quality is due to permanent and enforceable reductions in emissions." 42 U.S.C. § 7407(d)(3)(E)(iii). An area also could remain subject to maintenance requirements under the 1997 NAAQS even if it gains an initial designation as attainment for the 2008 standard. *See id.* § 7505a(a)-(b) (maintenance requirements remain in effect for twenty years). For both of those categories of areas, the Implementation Rule would revoke the 1997 conformity requirements without putting in place any conformity requirements for the 2008 NAAQS.

The parties agree that more than seventy such "orphan areas" existed at the time of the 2008 NAAQS effective date, including most of Massachusetts, as well as Detroit, Michigan, and Richmond, Virginia. In such areas, the conformity requirements would work to maintain ozone concentrations at safe levels in the face of new automobile emissions associated with proposed transportation projects. Under the Implementation Rule's approach, however, the statute would no longer require any inquiry into whether proposed transportation projects square with an orphan area's plans for maintaining safe ozone levels, notwithstanding

Congress's concern that motor vehicles present the largest source of ozone pollution.

It is true that orphan areas would have attained the 2008 standard, indicating an improvement in air quality. But those areas would be in either maintenance or nonattainment status for purposes of the still-operative 1997 standard. For any such areas in maintenance status, they would have already attained the 1997 standard—likewise indicating an improvement in air quality—yet Congress determined that they must continue to satisfy maintenance obligations, *id.* § 7505a, and must also remain subject to the conformity requirements for the same period, *id.* § 7506(c)(5)(B). For orphan areas in nonattainment status under the 1997 standard, there presumably would have been no showing of a permanent improvement of a kind that would have justified redesignation to attainment. *See id.* § 7407(d)(3)(E)(iii).

To be sure, an orphan area might again become subject to the conformity requirements if its air quality deteriorated and it were redesignated to nonattainment under the 2008 NAAQS. But by that point, it would be too late to prevent the adverse health and welfare effects associated with the interim increase in ozone levels—effects that might have been avoided if the conformity requirements had remained in place under the still-operative 1997 standard. And it may be markedly more difficult to reverse such an increase after the completion of new transportation projects than to avert the increase in the first place. *See* S. Rep. No. 101-228, at 28 (1989) ("By evaluating air quality impacts of proposed activities *before* they are undertaken, future pollution problems can be prevented." (emphasis added)).

EPA does not dispute that the Implementation Rule would wholly release orphan areas from otherwise-applicable

conformity obligations in that manner. The plain terms of the statute foreclose that result.

\* \* \* \* \*

We hold that the Implementation Rule's schedule of attainment deadlines exceeds EPA's authority under the statute. We further hold that the Implementation Rule's revocation of the 1997 NAAQS for transportation conformity purposes alone is contrary to the statute. Accordingly, we vacate the rule "to the extent that the court has sustained challenges to it." *South Coast Air Quality Mgmt. Dist. v. EPA*, 489 F.3d 1245, 1248 (D.C. Cir. 2007).

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, dissenting: The majority opinion treats this case as if it were facing a linguistic puzzle. The court's solution, we are told, is better than EPA's. And so the court sets aside two important aspects of EPA's regulations implementing its 2008 ozone standards. The court's decision and its reasoning are, I believe, mistaken.

The first subject of the majority opinion is EPA's judgment about when future attainment deadlines begin running. The Clean Air Act says nothing about when EPA should start the clock after the agency has issued new, stricter National Ambient Air Quality Standards (NAAQS) for ozone. The Supreme Court identified this timing gap in *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 483-84 (2001), and concluded that a reviewing court must defer to EPA's reasonable resolution of the statutory uncertainty. *Id.* at 484; *see also South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 896 (D.C. Cir. 2006), *clarified on denial of reh'g*, 489 F.3d 1245 (D.C. Cir. 2007).

The majority disagrees with EPA's decision to run the deadlines from December 31 rather than from July 20, 2012, when 2008 NAAQS designations became effective. Exactly why the majority disagrees with EPA is hard to discern. In large part, the majority's theory appears to rely on EPA's statement a decade ago that it had no "authority to change the attainment dates to November or December of the attainment year." *See* Maj. Op. at 24. As the majority sees it, EPA should be held to the concession that it lacked any statutory authority to run the deadlines from a date other than the designation date.[1]

---

[1] The Clean Air Act provides that areas designated nonattainment areas for ozone "shall be classified at the time of such designation, under table 1 . . .." 42 U.S.C. § 7511(a)(1). Table 1 establishes classifications and attainment dates for nonattainment areas with a "design value" – an area's ozone pollution level over three consecutive calendar years – that exceeded the one-hour NAAQS. Table 1 also establishes five classifications that correspond to design

2

Regardless of what EPA meant by its decade-old remark, it has made no such concession in this case. EPA has thoroughly explained why the end-of-year date is not only preferable but also perfectly consistent with the Clean Air Act. *See* Resp't Br. at 31-34. EPA's judgment is in harmony with Congress's intent as expressed in Table 1. The majority's view is not. EPA justified its decision on the basis that "it provides nonattainment areas with the same number of post-designation ozone seasons to demonstrate attainment as similarly-classified areas had under the 1990 Amendments." Resp't Br. at 31 (citing 77 Fed. Reg. 30,160, 30,166 (May 21, 2012)). Pursuant to the 1990 Amendments, "marginal nonattainment areas had three full ozone seasons (1991-1993) between the date of enactment and the November 15, 1993 deadline to attain the NAAQS." *Id.* at 31-32. I therefore disagree with the majority's conclusion that this interpretation "lacks any grounding in the statute," and "runs counter to all indicia of congressional intent." Maj. Op. at 24. What is not grounded in the statute is the majority's

value ranges, and it establishes attainment dates for each classification running from the date of enactment of the 1990 Amendments (November 15, 1990), not from the date of designation of the nonattainment areas. *Id.*

When Congress adopted the 1990 Amendments, EPA had already designated large areas of the country comprising half the population as nonattaining, that is, as having unacceptably high levels of ozone. *See* S. Rep. No. 101-228 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 3385, 3389. These nonattaining areas had already been engaged in pollution control efforts to comply with environmental deadlines that had already passed. *See South Coast*, 472 F.3d at 886-87. Accordingly, those nonattaining areas had more time to reach attainment than the three years stipulated for even marginally nonattaining areas under the 1990 Amendments. This history shows that EPA's deadlines were never as firm or limited as the majority would like to believe.

notion that once EPA issues its designations of areas, the attainment deadlines must begin running.[2]

As to what may appear to be EPA's contrary stance years ago, an "initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 863-64 (1984). Here, EPA was faced with the task of adapting Table 1's timeframes, which were effective in November 1990, to the July 2012 designations for the new ozone NAAQS. Those designations fell in the middle of an ozone season "a variable Congress did not face at the time it enacted the [Clean Air Act] Amendments in late 1990." Resp't Br. at 33. As EPA notes in its brief, in the early 1990s, EPA allowed marginal locations with year-round ozone seasons to extend the deadline until the end of the calendar year so that those areas could submit data for three full ozone seasons. *See* Resp't Br. at 32 n.8. Because the statute is ambiguous about this subject and because "[a]ttainment can only be demonstrated with monitoring data from three full and consecutive ozone seasons, which, for areas with year-round ozone seasons, means three full calendar years of monitoring data," Resp't Br. at 34 n.9 (citing 77 Fed. Reg.

---

[2] There is evidence, as EPA notes, that "Congress did not invariably consider a designation or classification as the trigger date for NAAQS attainment deadlines" regardless of circumstances. Resp't Br. at 29. First, Table 1 could have simply measured the attainment periods from the date of designation "but Congress instead chose to run the attainment periods from the date of enactment of the 1990 Amendments." Resp't Br. at 27. Second, other NAAQS attainment deadlines are pegged to different events. *See, e.g.*, 42 U.S.C. § 7511e (giving "transitional areas" designated nonattainment as of November 15, 1990 until December 31, 1991 to attain ozone standard).

8,197, 8,204 (Feb. 14, 2012)), EPA's accommodation is a reasonable interpretation of the Clean Air Act entitled to judicial deference. *See, e.g.*, *Envtl. Def. v. EPA*, 489 F.3d 1320, 1329 (D.C. Cir. 2007). In short, EPA's explanation (and its longstanding practice for areas with year-round ozone seasons) is more than sufficient. An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better . . .." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1235 (D.C. Cir. 2014) (per curiam).

This brings me to the second aspect of the implementing regulations the majority sets aside   EPA's revocation of the 1997 ozone standard for transportation conformity purposes. In *South Coast Air Quality Management District v. EPA*, 472 F.3d 882, the court upheld EPA's revocation of a prior NAAQS for ozone when it issued a new, stricter ozone NAAQS, as it did here. *Id.* at 899-900; *see also Natural Res. Def. Council v. EPA*, 643 F.3d 311, 315-16 (D.C. Cir. 2011). But in this case, the majority holds that EPA lacked the authority to revoke the prior NAAQS for transportation conformity purposes because it did not revoke the NAAQS in its entirety. *See* Maj. Op. at 28-30.[3]

NRDC never advanced this argument in its opening brief.

---

[3] As the majority notes, EPA has published a proposed rule that would revoke the 1997 ozone standard for *all* purposes. *See* Maj. Op. at 27-28; Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements, 78 Fed. Reg. 34,178 (June 6, 2013). While the rule is not yet final, it could very well undercut the distinction between revoking in whole and revoking in part on which the majority relies.

EPA, in its responsive brief, never mentioned it either. Although NRDC's reply brief disputes EPA's interpretation of *South Coast* and argues that *South Coast* does not authorize the EPA to revoke a NAAQS in part, that terse remark did not preserve the argument. *See* Reply Br. at 20. For good reason, we do not permit issues to "be raised for the first time in a reply brief." *Rollins Envtl. Servs. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991) (citing *McBride v. Merrell Dow & Pharm., Inc.*, 800 F.2d 1208, 1210-11 (D.C. Cir. 1986)). In addition, the argument in NRDC's reply brief is that EPA misinterpreted *South Coast*, not that the statute bars EPA from revoking the transportation conformity requirements because it did not revoke the entire 1997 NAAQS. *See* Reply Br. at 20.[4]

The majority's theory was never presented to EPA during the rulemaking either. For that reason, EPA said not a word about it in the lengthy preamble to the rule.[5] The Clean Air Act contains an explicit exhaustion requirement: "Only an objection

---

[4] NRDC's opening brief argues that the removal of the transportation conformity requirements for the 1997 NAAQS contravenes the Clean Air Act and that "under the guise of a 'partial revocation' of the 1997 NAAQS, EPA is claiming the power to pick and choose which parts of the Clean Air Act apply to nonattainment and maintenance areas." Pet. Br. at 37. But this argument is quite different from the argument NRDC advances in its reply brief, which NRDC doubtless waived anyway. *See Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) (per curiam) ("A litigant does not properly raise an issue by addressing it in a 'cursory fashion' with only 'bare-bones arguments.'") (quoting *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997)).

[5] During the comment period, the group Earthjustice stated that "EPA has no authority to suspend [transportation conformity requirements] by fiat," but as this conclusory comment itself indicates, this did not present the majority's theory with any specificity. J.A. 314.

to a rule or procedure which was raised with *reasonable specificity* during the period for public comment (including any public hearing) may be raised during judicial review." 42 U.S.C. § 7607(d)(7)(B) (emphasis added).[6] We have repeatedly applied a "strict[]" interpretation of the exhaustion requirement "to ensure that EPA has an opportunity to respond to every challenge" and so that "the court enjoys the benefit of the agency's expertise and possibly avoids addressing some of the challenges unnecessarily." *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998); *see also Util. Air Regulatory Grp. v. EPA*, 744 F.3d 741, 747 (D.C. Cir. 2014); *Natural Res. Def. Council v. EPA*, 559 F.3d 561, 563 (D.C. Cir. 2009).

In this case we have not had the benefit of EPA's response to the argument the majority sponsors, not in EPA's rulemaking proceedings    and, I should add, not in the briefs in this court, or in the oral argument before us.   I therefore believe the majority erred in reaching out to decide the case on a theory of its own devising.

Even if the majority's revocation-in-part argument were properly before us, I believe EPA's interpretation of the Clean Air Act is permissible.  The majority relies upon *Sierra Club v.*

---

[6] It is of no moment whether 42 U.S.C. § 7607(d)(7)(B) is jurisdictional, *contra EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1602 (2014), or quasi-jurisdictional, *see EEOC v. Fed. Labor Relations Auth.* ("*FLRA*"), 476 U.S. 19, 24 (1986).   The designation jurisdictional would be significant if the agency could have, but did not, raise the objection (that is, waived the objection) but the court nevertheless invoked it, as in *FLRA*.  Here EPA did not interpose a § 7607(d)(7)(B) objection to the sort of argument the majority embraces, but it could not have waived the objection for the quite apparent reason that petitioner's brief never made the argument.

*EPA* (*Sierra Club-conformity*), 129 F.3d 137, 138, 140 (D.C. Cir. 1997), to support its conclusion that EPA lacks authority to revoke the conformity requirements alone. *See* Maj. Op. at 30. *Sierra Club-conformity* held impermissible a grace period during which time newly designated nonattainment areas were exempt from conformity requirements. The Clean Air Act, the court wrote, "does not provide for any grace periods or other exemptions from the conformity requirements for areas designated as nonattainment areas, nor does it authorize the EPA to create such exemptions." *Sierra Club-conformity*, 129 F.3d at 138. The opinion is silent about revoking transportation conformity requirements themselves.

On that score, the Act indicates that conformity requirements apply "only" in nonattainment and maintenance areas, not in areas that have been removed from such status by the revocation of the underlying NAAQS. 42 U.S.C. § 7506(c)(5). We recognized EPA's authority to revoke existing NAAQS when it adopts a new standard for the same pollutant in *South Coast*, 472 F.3d at 899. The implication of *South Coast* is that transportation conformity requirements are not graved in stone. EPA can alter them, and the existence of the "anti-backsliding" provision of the Clean Air Act shows that Congress anticipated the revocation of some restrictions and their replacement with weaker controls. *See id.* at 899-900, 42 U.S.C. § 7502(e). Because I believe, as *South Coast* determined, that the Act does not prohibit EPA's revocation of the transportation conformity requirements, I disagree with the majority's view that an objective observer, looking only at the statutory language, would conclude that EPA violated the Act.

Beyond this, EPA had good reason for revoking the 1997 transportation conformity requirements. EPA explains that "[i]f the 1997 ozone NAAQS were to remain in place after conformity applies for the 2008 ozone NAAQS, . . . areas that

are currently nonattainment or maintenance for the 1997 ozone NAAQS and will be designated nonattainment for the 2008 ozone NAAQS would be required to implement the transportation conformity program for both ozone NAAQS concurrently." 77 Fed. Reg. at 30,167-68. "This could lead to unnecessary complexity," *id.* at 30,168, whereas revoking the 1997 ozone NAAQS "would bring certainty to the transportation planning process in ozone nonattainment and maintenance areas." *Id.* at 30,167. The majority claims that the 2008 rule leaves a gap in conformity coverage for some 2008 attainment areas. Maj. Op. at 32. But, as EPA notes, either these so-called "orphan areas" had attained the 1997 standard at the time EPA promulgated the 2008 standard, or, even if they had not, they would not create a concern because "the new NAAQS does not represent a 'relaxation' of an existing NAAQS" and is, in fact, stricter than the 1997 requirements. Resp't Br. at 48 n.15. If these areas are in attainment for new, stricter standards, there is no reason to force them to conform to prior, weaker ones to prevent backsliding. *See South Coast*, 472 F.3d at 900.

A few final points. Notably absent from the majority opinion is any discussion of how exactly EPA and the States are expected to implement the majority's decision. We do not know whether the majority intends that attainment deadlines set years ago must now be retroactively shortened as a result of court order. Still less do we know what sort of disarray this will cause throughout the country. And we do not know whether State and local transportation plans    plans approved and implemented, presumably after large effort and at great expense    must be retroactively disapproved. These and other problems are bound to arise as a result of what I consider a mistake in judicial analysis.

For these reasons, I respectfully dissent.